UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS CLEMMONS,

Petitioner,

v.

Case Number: 08-CV-11359
Honorable Avern Cohn

THOMAS BELL,

Respondent.

_______________________________/

**MEMORANDUM AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I. Introduction

This is a habeas case under 28 U.S.C. § 2254. Petitioner Marcus Clemmons, proceeding pro se, is a state inmate at the Bellamy Creek Correctional Facility in Ionia, Michigan.[1] Following a jury trial in Saginaw County circuit court, Petitioner was found guilty of (1) second-degree murder, (2) four counts of assault with intent to commit murder, (3) two counts of felony firearm, (4) one count of felon in possession, and (5) one count of carrying a concealed weapon. He was sentenced to (1) life in prison for the second-degree murder conviction, (2) thirty-five to sixty years in prison for the four counts of assault with intent to murder convictions, (3) the mandatory two years in prison for the two counts of felony-firearm convictions, (4) three to seven years for the felon in possession conviction, and (5) three to seven years for the carrying a concealed

[1]Petitioner was originally incarcerated at the Gus Harrison Correctional Facility. He has since been transferred to the Bellamy Creek Correctional Facility. Although the proper respondent is the warden of the facility where the petitioner is incarcerated, Rule 2(a) of the Rule Governing § 2254 Cases, because the petition is being denied, there is no reason to amend the caption.

weapon conviction.

Petitioner raises claims concerning prosecutorial misconduct, violations under the Confrontation Clause, improper jury instructions, and the trial court's failure to grant him a new trial based on newly discovered DNA evidence. Respondent, through the Michigan Attorney General's office, argues that the petition should be denied for lack of merit. For the reasons which follow, the petition will be denied.

## II. Facts and Procedural History

Petitioner's convictions arise from a drive-by shooting of Nicholas Green (Green), which occurred on July 19, 2004, in retaliation for the murder of Omar McKnight, one of Petitioner's close friends. Omar McKnight was killed on July 18, 2004. The retaliatory shooting took place on Saginaw's north side. Petitioner was charged, along with co-defendants Troy Bond, Tommy Keels, and Andre McKnight, Omar's brother. He was tried separately.

Before trial, in October 2004, two accomplice witnesses, Dilanjan Miller (Miller) and Tradell Feagin (Feagin), were provided immunity in exchange for their testimony.

Petitioner's trial began on August 30, 2005. The prosecution presented twenty witnesses and introduced more than seventy exhibits, including photographs of the crime scene and the vehicles involved, as well as shell casings and other evidence collected at the scene. The animosity between groups and gangs on the east-side and north-side in the City of Saginaw was noted by a number of witnesses.

Relevant testimony revealed that, on July 19, 2004, a group of five young men, including Green, was on Norman Street on Saginaw's north-side. This group was working on a car that would not start. The hood of one of the cars was up and another

car was facing it, as the group huddled around attaching jumper cables. Subsequently, a van drove by and shot into the group. Green who had been helping with the cables and holding up the hood was hit by the shots. The twenty-one-year-old Green suffered multiple gunshot wounds; he was transported to the hospital but died of internal bleeding from a bullet that penetrated his chest.

Miller testified as follows. He said that, the day after Omar McKnight was killed, a group gathered at the home of McKnight's mother, which included Petitioner, Feagin, Andre McKnight, and himself. According to Miller, Andre McKnight's east-side friend, Tommy Keels, managed to obtain the use of a 1985 Chevy van.

Miller further testified that, he, Petitioner, Tommy Keels, Andre McKnight, Troy Bond, Feagin, then began riding around in the van; he also said that they were smoking marijuana. According to Miller, Feagin was driving and Petitioner was in the passenger seat. He testified that Petitioner and Keels told Feagin to drive through the projects on the north side of Saginaw. It was Miller's testimony that Bond said, "if I see some –---- out there, I'm going to start shooting." (Trial Tr. vol. IV, 117-118, Sept. 2, 2005.) He said Bond had a small gun, a .22 or .25, on his lap.

According to Miller, as the van passed Norman Street, Petitioner and Keels told Feagin to turn around. Feagin complied, turned the van around, and went back down Norman Street, where some people were standing outside. Petitioner and Keels told Feagin to stop and when he did, directly by the cars with the hoods up, shots were immediately fired from the van. Miller testified that, as Feagin stopped the van by the cars with the hoods up, he looked toward the passenger side and saw Petitioner pull out a gun, point it out the open window, and start shooting. Miller said that he also saw

Bond and Keels start shooting out the windows, causing glass to fly all over. He said that Keels had a big black gun, a nine millimeter or .40 or .45 caliber.

Feagin testified that he also heard a lot of shots being fired from behind him in the van. Feagin said that after the shoots were fired, he then drove away from the scene. He said Petitioner gave him directions to turn down various streets, and that eventually, Petitioner told him to pull behind an apartment building, which he did. They then left the van.

The group of young men, working on the cars, was caught in the barrage of gunfire from the van, about thirty to forty shots in all.

Donte Bell testified that it was his car that broke down. He said that he called his friends, Jamal Young and Larry Darden, for help. When they arrived, he said that Green was with them. Bell testified that a van came upon them and started shooting. He said he could see the gun sparks flying from the van, particularly from the front and back passenger side of the van. According to Bell, there were no shots from the street.

Dr. Kanu Virani, a medical examiner, performed the autopsy on Green. He testified that he recovered the large-caliber bullet, which caused Green's injuries and turned it over to investigators. He explained that the location of the gunshot wounds on Green were consistent with the explanation that Green had been holding up the hood of an automobile when he was shot. The fired bullet recovered by Dr. Virani from Green was identified as a .40 caliber Smith & Wesson.

Jamal Young and Terrance Jones, who were in the group by the cars, were also injured by the gunfire.

Miller testified that, after the shooting, he was dropped off and told that he better

not say anything. Feagin testified that, the day after the shooting, Petitioner told him that Green had been killed and said, “don’t say nothing.” (Trial Tr. vol. III(1) 85, Sept. 1, 2005.)

Raheem Nash, who had been riding with the group in the van initially, was dropped off before the shooting, but observed Petitioner and Keels getting into the van with guns. He thought the gun that Petitioner had was a .40 caliber.

Testimony from the various police officers revealed the following:

Damage and bullet holes in the van were consistent with shots being fired from inside the van to the outside, but not with any projectile being fired into the van. Investigation at the crime scene revealed numerous casings around the two cars where the shooting occurred. A nine-millimeter semiautomatic luger pistol covered with blood was located in some grass near the scene between the sidewalk and the curb. There were nine rounds in the ten-round magazine of that gun with one round in the chamber. After inspecting the shooting scene and surrounding area, including use of a metal detector, investigators did not locate any fired cartridges that related back to that gun. The state police firearms expert concluded that one dirty and corroded fired cartridge case that was located in the area had been out there for a long period of time, before that night, and it could not be associated to the gun found in the grass.

Analysis of the other fired cartridge casings from the shooting scene revealed that there were several different types present: .40 caliber Smith & Wesson cartridge cases fired from a Glock pistol, a .22, and a type characteristic of a nine-millimeter and a .380 caliber. A total of thirty-five fired-cartridge cases was recovered from the interior of the van and from the shooting scene (street area, van and cars).

Firearms expert Ryan Larrison explained that laboratory analysis revealed all twelve of the fired .40 Smith & Wesson caliber cartridge cases from the shooting scene, and three from inside the van, were fired by the same Glock firearm. The nine-millimeter casings were also all identified as having been fired from the same nine-millimeter firearm. Similarly, the .22 casings were identified as having been fired from the same firearm. And, the .380 automatic caliber cartridge cases were all identified as having been fired by the same firearm. Analysis of the fired casings indicated four guns were fired inside the van, a .380 caliber, a nine-millimeter, a .40 caliber, and a .22 caliber.

On the third day of trial, the defense requested a mistrial because the prosecutor, in questioning witness Feagin, referred to the order granting him immunity and the provision that referred to giving truthful testimony. The trial court denied the motion, noting that the prosecutor is required to put before the jury any promises that have been made to the witness in exchange for his or her testimony and that the judge had already told the jury during voir dire that "this in no way is anybody saying that his testimony is truthful or not." (Trial Tr. vol. III(1), 89, Sept. 1, 2005.) The trial court repeated a cautionary instruction about immunity during Feagin's testimony after he was questioned about it by both sides.

Following closing arguments, instructions to the jury included cautionary instructions about witnesses' Feagin's and Miller's accomplice testimony. (Trial Tr. vol. VI, 84-87, Sept. 8, 2005.) Defense counsel had no objection to any of the jury instructions.

After about two hours of deliberations, the jury convicted Petitioner as stated above.

Subsequently, Petitioner, through counsel, filed an appeal of right with the Michigan Court of Appeals, asserting the following claims:

I. The prosecutor violated [Petitioner's] due process rights by eliciting on direct examination that two alleged co-defendants agreed to testify truthfully in exchange for immunity.

II. The trial court violated [Petitioner's] right to confrontation, to present a defense and due process by suppressing evidence of motive.

III. The trial court abused its discretion and denied [Petitioner] a fair trial by refusing to give the requested instruction on felonious assault.

IV. The trial court abused its discretion and denied [Petitioner] a fair trial by refusing to give the requested instruction in manslaughter and self-defense.

V. The trial court abused its discretion by denying [Petitioner's] motion for a new trial based upon newly discovered DNA evidence.

On May 8, 2007, the Court of Appeals affirmed Petitioner's convictions and sentences. People v. Clemmons, No. 278366, 2007 WL 1345867 (Mich. Ct. App. May 8, 2007). Petitioner then filed an application for leave to appeal that decision with the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied Petitioner's application on September 10, 2007. People v. Clemmons, 480 Mich. 862 (2007).

Petitioner thereafter filed the present habeas petition, raising the same claims as raised in both state appellate courts.

## III. Analysis

### A. Standard of Review

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court undertook a detailed analysis of the correct standard of review. According to the Supreme Court:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied-the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13 (O'Connor, J., delivering the opinion of the Court on this issue).

In evaluating a state-court decision under the "unreasonable application" clause, the Supreme Court further stated that a federal habeas court "should ask whether the

state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 411. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id.

The Supreme Court also clarified that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In determining what constitutes clearly established federal law, therefore, a federal habeas court must look to pertinent United States Supreme Court precedent.

A court must also presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. See Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

**B. Prosecutorial Misconduct**

Petitioner first claims that the prosecutor improperly vouched for the credibility of two witnesses by reading their immunity agreements, the terms of which included the phrase "truthful testimony." The Michigan Court of Appeals rejected the claim, reasoning:

> Defendant first argues on appeal that prosecutorial misconduct deprived him of his due process right to a fair trial. Generally, we review claims of preserved prosecutorial misconduct de novo, on a case-by-case basis, examining the prosecutor's remarks in context to determine whether defendant received a fair and impartial trial. Defendant argues that the

> prosecutor impermissibly vouched for the credibility of two accomplice witnesses by reading a term of their immunity agreements where they promised to give "truthful testimony concerning the crimes" charged against defendant in return for testimonial immunity. Prosecutors may not vouch for the credibility of their witnesses by claiming they have special knowledge that the witnesses are testifying truthfully. However, the mere disclosure of a plea agreement with a prosecutor's witness which requires truthful testimony is not deemed improper vouching or bolstering by the prosecutor, unless the prosecutor suggests special knowledge of the truthfulness of the witness. In this case, the prosecutor did not make additional commentary about the immunity agreements that suggested special knowledge of the witnesses' truthfulness, nor did he use the truthfulness requirement of the immunity agreements to badger a witness into contradicting prior testimony. There was no misconduct. And, we note that the trial court cured any potential prejudicial effect of the prosecutor's reference to the truthfulness requirement of the immunity agreements its instructions that the immunity agreements did not constitute judgments about the veracity of the witnesses, and that judging the credibility of the witnesses was the sole province of the jury.

Clemmons, No. 266331, 2007 WL 1345867, at *1 (citations omitted).

When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the court must consider that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. Serra v. Michigan Dep't of Corrs., 4 F.3d 1348, 1355-56 (6th Cir. 1993). In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the competent proof against the accused. Id*.*

A claim similar to Petitioner's was rejected in United States v. Trujillo, 376 F.3d

593 (6th Cir. 2004), where the prosecution noted that two witnesses "promised to be truthful and provide complete information" pursuant to their plea agreements. There, the Sixth Circuit held such remarks did not constitute improper vouching because the prosecution:

> did not offer any personal observations or opinions as to the veracity of either [] or [], nor did she place the prestige of the Government behind their credibility. Rather, the prosecutor's questions and comments merely encompassed the terms of [the] plea agreements which this Court has held to be permissible.

Id. at 608-09. See also United States v. Owens, 426 F.3d 800, 806 (6th Cir. 2005) (citations omitted) ("improper vouching includes either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury.").

Such is the case here. The prosecution did not imply that he had any specialized knowledge of whether the witnesses were testifying truthfully. Rather the prosecution simply outlined the terms of the agreements. As such, the Michigan Court of Appeals applied the correct standard and its application was neither contrary to nor an unreasonable application of Supreme Court precedent. Petitioner is not entitled to habeas relief regarding this claim.

**C. Right to Confrontation and Right to Present a Defense**

Petitioner next claims that his right to confront witnesses against him and his right to present a defense were violated when the trial court excluded evidence that Green had cocaine in his pocket at the time of his death. As to this claim, the Michigan Court of Appeals stated:

> The evidence of the decedent's possession of cocaine did not

> make any fact that was of consequence more or less probable. The decedent did not testify against defendant; therefore, his credibility was not at issue. The decedent's possible status as a cocaine dealer or cocaine user also did not increase or decrease the likelihood that defendant acted in self-defense. A person is justified in using deadly force against another in self-defense if, under the totality of the circumstances, the person honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force. Defendant produced no evidence that demonstrated that he or his codefendants knew that the decedent possessed cocaine at the time or the shooting, that the decedent was a cocaine dealer or user, or even that they knew the decedent. Defendant established no connection between the decedent's possession of cocaine and weapon found near the scene. Moreover, unless defendant knew that the decedent possessed cocaine, the testimony was entirely irrelevant to defendant's state of mind at the time of the shooting. In addition, defendant was not prohibited from arguing that he acted in self-defense or that the gunshot that ended the decedent's life came from someone other than the occupants of the blue van. The trial court did not abuse its discretion in precluding evidence of the decedent's cocaine possession, nor did the trial court infringe upon defendant's right to present any defense based on the preclusion of that evidence.

Clemmons, No. 266331, 2007 WL 1345867, at *2 (citations omitted).

First, in regard to Petitioner's right-to-present-a-defense claim, the Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. There was no evidence that anyone in the van knew that Green possessed drugs. And, it appears from the record that Petitioner was not offering the evidence of the victim's possession of drugs to support a specific theory of defense, but rather, to attack his general character.

Moreover, although framed as a denial of due process, this claim actually challenges the trial court's evidentiary ruling. Such claims are not cognizable on federal habeas review. It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. See Estelle v. McGuire, 502 U.S. 62,

67-68 (1991). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. See Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). As such, Petitioner is not entitled to habeas relief on this ground.

Second, regarding Petitioner's Confrontation Clause claim, the Michigan Court of Appeals stated:

> We also find that defendant's right to confront witnesses against him was not violated. A Confrontation Clause issue may arise when a witness asserts the Fifth Amendment, but it does not arise where a witness does not give any substantive testimony. Implicit in federal confrontation clause jurisprudence is the notion that a witness must put forth some testimony before the defendant's right of confrontation can be invoked. Because the decedent did not testify at trial, defendant's right of confrontation was not violated.

Clemmons, No. 266331, 2007 WL 1345867, at *2 (citations omitted).

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defendant might wish.'" United States v. Owens, 484 U.S. 554, 559 (1988) (citations omitted).

Here, there was no indication that Petitioner knew that Green had drugs in his pocket. Moreover, whether Green possessed drugs was not at issue. In essence, Petitioner is attempting to federalize a non-cognizable challenge to the trial court's evidentiary ruling by invoking the Confrontation Clause. Although Petitioner suggests that drugs could have been a motive for the shooting, he does not explain how that had

any impact on the evidence of his participation in the shooting. Thus, Petitioner's confrontation claim lacks merit and he is not entitled to relief.

**D. Jury Instruction Claims**

Petitioner next claims that he was denied a fair trial by the trial court's failure to give several instructions to the jury. Specifically, Petitioner contends that the jury should have been instructed on felonious assault, manslaughter, and self-defense.

The fact that the jury instructions may have been "incorrect under state law is not a basis for habeas relief." Estelle, 502 U.S. at 71-72. Furthermore, the United States Supreme Court has not decided whether due process requires the giving of jury instructions on lesser-included offenses in non-capital cases. See Beck v. Alabama, 447 U.S. 625, 638 n. 14 (1980). The Sixth Circuit therefore has concluded that "the Constitution does not require a lesser-included offense instruction in non-capital cases." Campbell v. Coyle, 260 F.3d 531, 541 (6th Cir. 2001) (citing Bagby v. Sowders, 894 F.2d 792, 795-97 (6th Cir. 1990) ( en banc )). "[F]ailure to instruct on a lesser included offense in a non-capital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" Scott v. Elo, 302 F.3d 598, 606 (6th Cir. 2002) (quoting Bagby, 894 F.2d at 797). Thus, Petitioner is not entitled to relief on his jury instruction claim.

Even if Petitioner's claim was cognizable on habeas review, a defendant generally is entitled to a jury instruction on a recognized defense only if sufficient evidence exists for a reasonable jury to find in his favor. Mathews v. United States, 485 U.S. 58, 63 (1988) (citations omitted). "[D]ue process does not require an instruction on a lesser-included offense if the evidence does not support such an instruction." Bowling

v. Parker, 344 F.3d 487, 500 (6th Cir. 2003) (citing Hopper v. Evans, 456 U.S. 605, 611 (1982)). Moreover, failure to give a lesser included offense instruction may serve as grounds for habeas relief only if "the state court so manifestly and flagrantly violated its own clearly stated law in refusing the requested instruction, that the petitioner was denied due process of law." Todd v. Stegal, 40 F.App'x 25, 28 (6th Cir. 2002) (citation omitted). However, the Sixth Circuit has indicated that "such occasions would be rare," and that relief would be warranted under such a theory only where "the failure to give the instruction amounts to a fundamental miscarriage of justice likely to have resulted in the conviction of an innocent person." Id.

First, the trial court's failure to instruct the jury about felonious assault does not warrant habeas relief because felonious assault is not a lesser-included offense of assault with intent to commit murder. The state court's ruling that Petitioner was not entitled to the instruction is objectively reasonable, and Petitioner is not entitled to habeas relief on this ground.

Second, Petitioner was not entitled to a voluntary manslaughter instruction. In Michigan, voluntary and involuntary manslaughter are necessarily lesser-included offenses of murder, and an instruction on both offenses must be given if a rational view of the evidence supports the instruction. People v. Mendoza, 468 Mich. 527, 541 (2003).

> "[M]urder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter-malice-is negated by the presence of provocation and heat of passion."

Id., 468 Mich. at 540, 664 N.W.2d at 692 (internal citation omitted).

Here, there was insufficient evidence of provocation to reduce the crime to manslaughter. All the evidence presented at trial indicated that the victims were attacked by a drive-by shooting. There was no evidence presented that the victims antagonized, provoked, or instigated an assault on Petitioner and his friends. Thus, the Court of Appeals correctly concluded that the trial court properly denied Petitioner's request for an instruction on voluntary manslaughter.

Finally, Petitioner says he was denied a fair trial when the trial court refused to instruct the jury on self-defense. The trial court said that the instruction was not warranted because the defense was not supported by the evidence, and the Michigan Court of Appeals reached the same conclusion. The Court agrees. There was no evidence of self-defense. The state courts' conclusions were not based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law.

Overall, Petitioner fails to establish any instructional error. He cannot show that the state court's failure to instruct on lesser included offenses rendered his trial fundamentally unfair. Therefore, Petitioner is not entitled to habeas relief with respect to these claims.

**E. Newly Discovered DNA Evidence Claim**

In his last habeas claim, Petitioner says that the trial court abused its discretion in refusing to grant him a new trial based upon newly discovered DNA evidence, indicating that Green's blood was present on a nine-millimeter gun

found near the scene of the shooting.

"A claim that a habeas petitioner is entitled to relief based upon the failure of a state trial judge to grant him a [new] trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding." Monroe v. Smith, 197 F.Supp.2d 753, 763 (E.D. Mich. 2001) (citation omitted). "Absent an independent constitutional violation, claims of actual innocence based on newly discovered evidence fail to state a ground for which habeas relief may be granted." Herrera v. Collins, 506 U.S. 390, 400 (1993). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 624 (1998).

Regarding this claim, the Michigan Court of Appeals stated:

> Defendant cannot demonstrate that evidence that the decedent's blood was on the 9-millimeter gun found at the scene of the shooting would make a different result probable on retrial. Evidence that the gun was found at the scene of the shooting was admitted at trial, but evidence that the decedent's blood was present on that handgun does not prove that the decedent brandished the weapon or that defendant and his cohorts knew that the decedent carried a weapon. Defendant presented no evidence indicating that the shooting occurred in response to an immediate threat posed by the decedent. Thus, the "new" evidence would not have affected the verdict.

Clemmons, No. 266331, 2007 WL 1345867, at *4.

Under the circumstances of this case, a drive-by shooting, the victim's blood would likely be discovered on several items at or near the shooting. Thus, the presence of blood on the nine-millimeter gun has no bearing on Petitioner's

identity as one of the shooters, his presence in the van, or the fact that he fired into a group of people standing on the street. Petitioner has failed to make a claim of actual innocence. He is not entitled to habeas relief on this claim.

## IV. Conclusion

For the reasons stated above, Petitioner has failed to show that he is entitled to habeas relief on any of his claims. Accordingly, the petition is **DENIED**. This case is **DISMISSED**.

**SO ORDERED.**

s/ Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: October 14, 2009

I hereby certify that a copy of the foregoing document was mailed to Marcus Clemmons, 454920, Gus Harrison Correctional Facility, 2727 E. Beecher Street
Adrian, MI 49221 and the attorneys of record on this date, October 14, 2009, by electronic and/or ordinary mail.

s/ Julie Owens
Case Manager, (313) 234-5160